## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 13-50991-CAG |
| WARREN'S CORNER, L.P. | § | |
|    Debtor | § | CHAPTER 11 PROCEEDING |

### WARREN'S CORNER, L.P.'S DISCLOSURE STATEMENTFOR ITS FIRST AMENDED PLAN OF REORGANIZATION <u>PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE</u>

DATED:     October 15th, 2013, 2013
                SAN ANTONIO, TEXAS

Respectfully submitted,

LAW OFFICES OF WILLIAM B. KINGMAN, P.C.
4040 Broadway, Suite 450
San Antonio, Texas 78209
Telephone: (210) 829-1199
Facsimile: (210) 821-1114

By:  */s/ William B. Kingman*
William B. Kingman, State Bar No. 11476200
**ATTORNEYS FOR THE DEBTOR**

NOTICE: THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT FOR USE IN THE SOLICITATION OF ACCEPTANCES OF THE DEBTOR'S PLAN OF REORGANIZATION. THE DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN PROPOSED BY THE DEBTOR. PLEASE READ THIS DOCUMENT WITH CARE.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 13-50991-CAG |
| WARREN'S CORNER, L.P. | § | |
| Debtor | § | CHAPTER 11 PROCEEDING |

**WARREN'S CORNER, L.P.'S DISCLOSURE STATEMENT**

**I.
INTRODUCTION**

A. <u>Identity of Debtor</u>

On April 16th, 2013, Warren's Corner, L.P. (the "Debtor" or "Warren's Corner") filed a voluntary petition pursuant to Chapter 11 of Title 11 of the United States Code (the "Code") with the United States Bankruptcy Court for the Western District of Texas, San Antonio Division. An Order for relief was entered on the respective date of filing.

B. <u>Sophisticated Nature of Creditors and this Disclosure Statement</u>.

The Debtor's First Amended Plan of Reorganization (the "Plan") deals with the payment of debt held by highly sophisticated Creditors and parties-in-interest, and for that reason, the Debtor considers the Creditors as sophisticated investors and has included information concerning operations, values and other analysis intended to furnish financial and legal information which should be reviewed only after each Creditor has a complete understanding of the Plan.

C. <u>Important Plan Definitions/Explanations</u>.

The Plan contains numerous definitions found in Article I of the Plan. These terms are generally capitalized to indicate that they are defined terms. Such definitions include explanations which are enforceable as the terms of the Plan. Reference should be made to the definition section. Several of these definitions are explained throughout this Disclosure Statement; however, such explanation is not intended as a substitute for a full and complete reading and understanding of the definitions. Emphasis is placed on these definitions as they are an integral part of the Plan.

D. <u>Nature and Purpose of this Disclosure Statement</u>

Pursuant to §1125 of the Code, the Bankruptcy Court for the Western District of Texas, San Antonio Division, the Honorable Craig Gargotta presiding, (the "Court") may approve this Disclosure Statement for submission to the holders of claims against the Debtor. The purpose of

this Disclosure Statement is to provide such information as the Bankruptcy Court deems material and necessary for the creditors, investors and other parties in interest to make a reasonably informed decision in exercising their right to vote for acceptance or rejection of the Debtor's Plan of Reorganization (the "Plan"). A copy of the Plan has been filed with the Court and is incorporated herein for all purposes. A copy of the Plan is available for review at the United States Bankruptcy Clerk's office in San Antonio, Texas or is available upon written request from the Debtor's counsel.

The Court's approval means that this statement contains adequate information. Such approval does not constitute a judgment by the Court as to the desirability of the Plan or as to the value of any consideration offered thereby. Interested parties are referred to 11 U.S.C. §1125 which reads, in part:

"... (b) An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information. The court may approve a disclosure statement without a valuation of the debtor or an appraisal of the debtor's assets ..."

"(d) Whether a disclosure statement...contains adequate information is not governed by any otherwise applicable non-bankruptcy law, rule, or regulation, but an agency or official whose duty is to administer or enforce such a law, rule, or regulation may be heard on the issue of whether a disclosure statement contains adequate information. Such an agency or official may not appeal from an order approving a disclosure statement..."

"(e) A person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of this title, or that participates, in good faith and in compliance with the applicable provisions of this title, in the offer, issuance, sale, or purchase of a security, offered or sold under the plan, of the debtor, of an affiliate participating in a joint plan with the debtor, or of a newly organized successor to the debtor under the plan, is not liable, on account of such solicitation of participation, for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan or the offer, issuance, sale, or purchase of securities."

E. <u>Nature of Chapter 11 of Title 11 of the United States Code</u>

Chapter 11 of the Bankruptcy Code was designed by Congress to allow a financially troubled debtor to attempt to reorganize and restructure his, her or its debts. Chapter 11 contemplates allowing the Debtor or its creditors or other parties to prepare a Plan of Reorganization which provides for the Debtor's payment of all or part of its debts over a specified period of time. After the Plan is filed and the Disclosure Statement is approved, the creditors are given an opportunity to accept or reject the Plan. If the requisite number of creditors approve the Plan and/or the Court deems the Plan to be confirmable pursuant to §1129 of the Code, then the reorganized Debtor's then pay all or a portion of its debts pursuant to the terms of the Plan.

F.   Process of Confirmation

   1.   The Hearing.

   The Bankruptcy Court has set a hearing on the confirmation of the Plan for _____ , 2013 at _____ a.m.

   2.   Requirements of Plan Confirmation.

   A Creditor, in order to vote, must have filed a Proof of Claim or Interest at or prior to the Bar Date or must be listed as holding a claim that is undisputed and not contingent or unliquidated in the Debtor's Bankruptcy Schedules on file with the Court. Absent an affirmative act constituting a vote accepting or rejecting the Plan, such Creditor and such Creditor's Claim will not be included in the tally.

   If a Creditor is eligible to vote, he may vote to accept the Plan by filling out and mailing the ballot which the Debtor has provided him/her/it as instructed. Whether the Creditor votes on the Plan or not, such person will be bound by the terms and treatment set forth in the Plan if the Plan is accepted by the requisite majorities of Creditors and/or otherwise confirmed by the Court.

   In order for the Plan to be accepted by Creditors, a majority in number, and a two-thirds majority in amount of Claims filed and allowed and actually voting, of each impaired class of Creditors must vote to accept the Plan. In order for the Plan to be accepted by equity holder, if any, a two-thirds majority in amount of interest allowed (for voting purposes) and voting of each impaired class of interests must vote to accept the Plan.

   Upon your receipt of the Court approved Disclosure Statement and a copy of the Plan attached hereto, you are urged to fill in, date, sign and promptly mail the enclosed ballot which the Debtor will be furnishing to you. PLEASE BE SURE TO PROPERLY COMPLETE THE BALLOT AND IDENTIFY THE NAME OF THE CLAIMANT.

   The Debtor or others may solicit your vote. The cost of any solicitation by the Debtor will be borne by the Debtor. No representative of the Debtor, other than its attorney, shall receive any additional compensation for any solicitation.

   3. Cramdown.

   If the Plan is rejected by one or more impaired Classes of Claims or interests held by the Debtor's Creditors, the Plan or a modification thereof may still be confirmed by the Court if the Court determines, among other federal requirements, that the Plan does not discriminate unfairly and is fair and equitable with respect to the rejecting Class or Classes of Claims or interests impaired by the Plan. The Debtor, as the Plan proponent, has requested in the Plan and does hereby request that such a determination (commonly referred to as a "cram-down") be made if the Plan or modification thereof is not accepted by all of the impaired classes of Claims or interests held by Creditors or investors.

G.  Voting Procedures and Requirements

1.   Ballots and Voting Deadline

In addition to this Disclosure Statement and a copy of the Plan, each Creditor entitled to vote will be provided with a ballot to be used for voting to accept or reject the Plan, together with a postage paid return envelope.

In order to be counted for voting purposes, ballots for the acceptance or rejection of the Plan must be completed and returned (by electronic mail, facsimile, hand deliver or regular mail) to the Debtor's counsel on or before **5:00 p.m. on_____, 2013**. Furthermore, any creditor or party in interest desiring to object to the Plan must do so by filing a written objection in the United States Bankruptcy Clerk's office at 605 E. Houston St., Sutie 597, San Antonio, TX 78205 on or before_____**, 2013.** Such written objection must also be served on Debtor's counsel at the address below.

Whether or not the Creditor entitled to vote expects to be present at the hearing, each Creditor is urged to complete, date, sign and send (by electronic mail, facsimile, hand delivery or regular mail) the ballot to the Debtor's counsel at the following address:

> William B. Kingman
> Law Office of William B. Kingman, P.C.
> 4040 Broadway, Suite 450
> San Antonio, Texas  78209
> Telephone-(210) 829-1199
> Facsmile-(210) 821-1114
> Email-bkingman@kingmanlaw.com

2. Creditors Entitled to Vote

Any Creditor whose Claim is impaired under the Plan is entitled to vote, if it has filed a Proof of Claim on or before the Bar Date of August 12th, 2013 for non-governmental Creditors and November 13th, 2014 for governmental Creditors, which are the dates set by the Bankruptcy Court for such filings or if it is scheduled as a holder of a claim that is undisputed, liquidated and is not listed as contingent in the Debtor's Schedules on file with the Court.  Claims filed pursuant to assumption or rejection of Executory Contracts should also refer to Section VII of the Plan for special requirements regarding their Claims.

Any Claim as to which an objection has been filed (and such objection is still pending) is not entitled to vote, unless the Bankruptcy Court temporarily allowed the Claim in an amount which it deems proper for the purpose of accepting or rejecting the Plan upon application by the Creditor.  Such application must be heard and determined by the Bankruptcy Court at such time as specified by the Bankruptcy Court.  A Creditor's vote may be disregarded if the Bankruptcy Court determines that the Creditor's acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

3. <u>Definition of Impairment</u>

Under Section 1124 of the Bankruptcy Code, a class of Claims or equity security interests is impaired under a Chapter 11 plan unless, with respect to each Claim or interest of such Class, the Plan:

1. Leaves unaltered the legal, equitable, and contractual rights of the holder of such Claim or equity security interest; or

2. Notwithstanding any contractual provision or applicable law that entitles the holder of a Claim or equity security interests to receive accelerated payment of his Claim or equity security interests after the occurrence of default:

   a. Cures any such default that occurred before or after the commencement of the case under the Bankruptcy Code, other than a default that consists of a breach of any provision relating to the insolvency or financial condition of the Debtor at any time before the closing of the case, the commencement of a case under the Bankruptcy Code, or the appointment of or taking possession by a trustee in a case under the Bankruptcy Code;

   b. Reinstates the maturity of such Claim or equity security interest as it existed before the default;

   c. Compensates the holder of such Claim or equity security interest for damages incurred as a result of reasonable reliance on such contractual provision or applicable law; and

   d. Does not otherwise alter the legal, equitable, or contractual rights to which such Claim or equity security interest entitles the holder of such Claim or equity security interest; or

3. Provides that, on the Plan Effective Date, the holder of such Claim or equity security interest, receives, on account of such Claim or equity security interest, cash equal to:

   a. With respect to a Claim, the allowed amount of such Claim; or

   b. With respect to an equity security interest, if applicable, the greater of:

   (i) Any applicable fixed liquidation preference; or

   (ii) Any fixed price at which the Debtor, under the terms of the security, may redeem the security.

    4.        <u>Classes Impaired Under the Debtor's Plan</u>

The following Classes of Claims are impaired under the Plan, and Creditors holding Claims in such Classes are entitled to vote to accept or reject the Plan:

Classes 1, 2 and 3

Class 4 is an unimpaired class under the Plan.

## II.
## REPRESENTATIONS

A.  <u>Disclaimers</u>

    1.    NO REPRESENTATIONS CONCERNING THE DEBTOR OR THE PLAN OF REORGANIZATION ARE AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE BY ANY PERSON TO SECURE YOUR VOTE WHICH ARE OTHER THAN HEREIN CONTAINED SHOULD NOT BE RELIED UPON AND SUCH REPRESENTATIONS OR INDUCEMENTS SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR, WHO SHALL DELIVER SUCH INFORMATION TO THE BANKRUPTCY COURT.

    2.    THE COURT'S APPROVAL OF THE DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT OF ANY OF THE REPRESENTATIONS CONTAINED IN EITHER THE DISCLOSURE STATEMENT OR THE PLAN, NOR DOES IT CONSTITUTE AN ENDORSEMENT OF THE PLAN ITSELF.

## III.
## BACKGROUND INFORMATION ON DEBTOR AND THE PLAN AND THE NATURE AND HISTORY OF THE DEBTOR

A.    <u>Financial History and Background of the Debtor and Factors Leading to Bankruptcy Filing</u>

In 2005, Warren's Corner purchased 4.416 acres of real property located on the corner of Broadway and Loop 410 in San Antonio, Texas. Demolition of the existing buildings began in early 2006 and Warren's Corner completed construction of a two story, 39,333 square foot office/retail building in August 2006.

Tenants began occupying the building in Dec., 2006. Due to ongoing Texas Department of Transportation construction on the adjacent Loop 410 (which commenced in 2006 and was not completed until 2012), access to the facility was limited. Lack of access, combined with the general economic slowdown which occurred during the same period, hindered leasing and affected the Warren's Corner's ability to service debt due and owing to First National Bank.

After numerous attempts to restructure its debt with First National Bank, Warren's Corner determined that it was in its best interest to file for protection and relief under Chapter 11 of the United States Bankruptcy Code. As a result, Warren's Corner commenced this case on April 16th, 2013.

B.      Operations in Chapter 11

Upon the filing of the bankruptcy proceeding, Warren's Corner continued discussions with First National Bank regarding the restructuring of its debt. Through such negotiations, the Debtor and First National Bank reached an agreement relating to the re-payment of the First National Bank claim.

Furthermore, Warren's Corner has continued to manage and lease its property. As a result of leasing activity, the property currently has an 82% occupancy rate. Currently, the property has $52,446.21 of monthly rental income and $7,780.52 of monthly expense reimbursement, totaling $60,226.73 of monthly gross income. Monthly expenses average $11,862.23 leaving $48,364.50 monthly to satisfy property taxes, expenses and debt service.

Warren's Corner has continued to pay all of its post-petition obligations, while escrowing for 2013 real property taxes and also paying First National Bank monthly payments pursuant to the provisions of court orders entered in this proceed.

.The Debtor's monthly operating reports filed in the case for the period of April 16th, 2013 through August 31st, 2013 are on file with the Court and are available for creditors' review. A copy of the monthly operating report for the period ending August 31st, 2013 is attached hereto as Exhibit "A". The Debtor will timely file all future monthly operating reports. If a Creditor would like a copy of these operating reports, they may request a copy in writing from the Debtors' counsel.

C.      Future Income and Expenses under the Plan

The Debtor will continue to receive income from its rental income. Furthermore, as set forth in Exhibit "B", the Debtor believes that they will and can pay its creditors with allowed claims more than the amount that they would receive if this case were converted to a Chapter 7 liquidation proceeding. Attached hereto as Exhibit "B" is Warren Corner's monthly budget that indicates that it can satisfy its future expenses and plan payments.

D.      Future Management of Debtor's Businesses

Warren's Corner's general partner's managing member, David Monnich will continue to manage the Debtor's business after plan confirmation.

E.      Accounting Method and Source of Financial Information

The accounting method used by the Debtor is the cash method. The financial information submitted in connection herewith was compiled by the Debtor from its business records and

8

monthly operating reports filed in the Case.

## IV.
## ANALYSIS AND VALUATION OF PROPERTY

A.  <u>Schedule of Assets, Value Listed in Debtor's Schedules, Current Market Value and Lienholder Information</u>

<u>Exhibit "C"</u> attached hereto is a schedule of Debtor's assets, values from Debtor's schedules, approximate current market and liquidation values and lienholder information:

B.  <u>Liquidation Analysis</u>

If this case were converted to a Chapter 7 proceeding, the Debtor does not believe that the unsecured creditors would receive any of their respective claims since the Debtor's lienholders (including ad valorem taxing authorities) would seek relief from the automatic stay in order to obtain authorization to foreclose on their collateral.

However, if the Debtor is allowed to continue to operate through its Plan, the Debtor believes that all "non-insider" unsecured creditors with Allowed Claims will be paid in full. In connection therewith and as set forth above, attached hereto as <u>Exhibit "B"</u> is the Debtor's projection of monthly income and expenses., Warren's Corner believes that, based upon historical data, revenues and expenses in the last quarter of 2013 and thereafter will be similar to current revenues and expenses, subject to adjustments for inflation and projected increases in rental income.

C.  <u>Source and Basis of Valuation Analysis</u>

The above-described market value of Debtor's property is based upon the Debtor's current estimates of the property's value. The Debtor's liquidation analysis is based upon Debtor's representatives' opinion of value (after reviewing published information relating to values of similar assets) and from the Debtor's books and records.

## V.
## SUMMARY OF PLAN OF REORGANIZATION

If a Creditor does not receive a copy of the Plan, the Plan will be provided upon request to all Creditors or possible Creditors. The Plan should be read carefully and independently of this Disclosure Statement. The following summary is not intended as a substitute for reading the Plan.

The Plan is simple in concept. The Plan provides for the full or partial satisfaction of the Allowed Claims of all Creditors. However, only Allowed Claims will receive the treatment and distributions specified in the Plan. Under the Plan, the Creditors will receive distributions in the form of cash on and/or after the Initial Distribution Date.

With respect to filing and allowance of Claims, all Claims assertable and arising prior to the Petition Date and all Claims assertable and arising during the Case, excluding Rejection Claims and Administrative Claims incurred for Professional Fees, shall be Allowed Claims, unless the Court disallowed by the Court after notice and opportunity for hearing. If a Claimant has already filed a Proof of Claim with the Bankruptcy Clerk, another Proof of Claim need not be filed by such Claimant, unless such previously filed Proof of Claim does not state the total dollar amount of indebtedness owed to such Claimant, including, without limitation, penalties and/or interest on such Claim. Claims filed pursuant to assumption or rejection of Executory Contracts should also refer to Section VI of the Plan for special requirements regarding their Claims. The Debtor reserves the right to dispute, or assert offsets or defenses against any Claims as to amount, liability or status.

Furthermore, all Administrative Claims in the Case: (i) for Professional Fees under Section 330 of the Bankruptcy Code, including, but not limited to attorneys' and accountants' fees, and for any other administrative expenses which arose on or before the Confirmation Date shall be filed with the United States Bankruptcy Clerk in Austin, Texas within ninety (90) days after the Effective Date.

A. <u>Summary of Classes and Estimation of Administrative Claims and Scheduled Claims</u>

1. <u>Administrative Claimants</u>: Creditors holding Allowed Administrative Claims relative to the Case, including the U.S. Trustee's Claim for allowed fees-Estimated Amount of Claims-$20,000.00

2. <u>Class 1</u>: Secured Creditors holding Allowed Property Tax Claims against Warren's Corner-$233,000.00

3. <u>Class 2</u>: First National Bank, to the extent it holds an Allowed Secured Claim against Warren's Corner-$7,300,000.00;

4. <u>Class 3</u>: Creditors Holding Allowed Unsecured Claims-$1,970,000.00 (of which approximately $6,000.00 is due and owing to non-insiders); and

5. <u>Class 4</u>: Equity Security or Interest Holders

The estimated amount of the claims above is based upon the Debtor's records and the claims that have been filed in this proceeding. However, it should be noted that the claims in each of the above-referenced classes are subject to objection and disallowance.

B. <u>Treatment of Administrative Claims and Classes</u>

1. <u>Administrative Claims and Unimpaired Class</u>: Each holder of an Allowed Administrative Claim (the Debtor's accountant and attorney) shall be paid in full in cash upon the Distribution Date, except as may be otherwise agreed upon in writing between Debtor and each respective Administrative Claimant.

Furthermore, all trade debts, if any, and all other obligations incurred in the normal course of business by the Debtor after the Petition Dates shall be paid in full when due in the ordinary course of business. Such payments shall be distributed from the cash and the Debtor's operations on or after the Distribution Date.

Class 4 Equity Interest Holders are unimpaired and shall retain their interest in the Debtor

2. <u>Impaired Classes</u>  The Creditors holding an Allowed Claim in Classes 1, 2, 3 and 4 are impaired and will be entitled to vote to accept or reject their respective treatment under the Plan.

2.01. <u>Class 1</u>: Revested Debtor Warren's Corner, commencing on the Distribution Date and continuing monthly thereafter for a period of fifty nine (59) additional consecutive months after the Distribution Date to the Class 1 Creditor, shall pay the Class 1 Creditor's Allowed Claim in sixty equal monthly installments with interest accruing thereon at the rate of 12% per annum. The interest to be paid as described herein shall be deemed to have commenced accruing as of the Effective Date. The monthly payment to the Class 1 Creditor shall be determined by amortizing the Allowed Claim over a period of 60 months and applying an interest rate of 12.0%. Class 1 Creditors will retain their lien on the property securing payment of their respective claims until such Allowed Claims are paid in full.

2.02 <u>Class 2</u>: In order to satisfy the Class 2 Creditor's Allowed Class 2 Claim, Warren's Corner shall execute two notes payable to the Class 2 Creditor. The first note will be in the principal balance of $5,800,000.00. Interest will accrue at the rate of 5.25% and payments will be amortized over a 30 year period, with the maturity date of the note being seven (7) years from the Distribution Date. In connection with the foregoing, Warren's Corner shall pay the Class 2 Creditor equal monthly principal and interest payments of $32,027.81, commencing on the Distribution Date and continuing monthly thereafter for an additional seventy one (71) consecutive months. On the date that is 72 months after the Distribution Date (the new maturity date of the first promissory note evidencing the Allowed Secured Claim due and owing to the Class 2 Creditor), Warren's Corner shall pay the Class 2 Creditor the seventy-second and final installment which shall equal the entire outstanding amount of principal and accrued and unpaid interest, The interest to be paid as described herein shall be deemed to have commenced accruing as of the Effective Date.

The second note will have a principal balance of the $1,500,000.00. This note will be a "cash flow" mortgage. Warren's Corner annual net cash flow after paying its operating expenses and plan payments (including the above-described $32,027.81 note payments) will be utilized to reduce the balance of this note. Warren's Corner shall, on or before January 31st of each year (commencing in 2015 and continuing until January 31st, 2020) pay 75% of its annual net cash flow (after also deducting plan payments) to the Class 2 Creditor to reduce the second note's balance. On January 31st, 2020, the note shall be deemed fully satisfied and paid in full and the Class 2 Creditor shall be deemed to have released Warren's Corner and all guarantor(s), if any, from all obligations relating thereto.

All of the remaining provisions of the loan documents evidencing the Class 2 Creditor's Allowed Secured Claim and executed by the Debtor shall remain in full force and effect, but new documents evidencing the modification of the loan documents' terms, as provided herein, may be executed. Furthermore, the Class 2 Creditor will, until its Allowed Claim is paid pursuant to the provisions of this Plan and the related notes, retain its security interest in and liens on the Debtor's assets which serve as security for the payment of its Allowed Claim. In addition, the Class 2 Creditor's guaranty(ies), if any, of the Class 3 Claim shall remain in full force and effect. However, the Class 2 Creditor shall release its liens on its collateral if the Class 2 Creditor receives $5,700.000.00 in net proceeds from the sale of the property or any third party refinancing of the Class 2 Creditor's Allowed Claim during the 7 year term of the first note described above. Furthermore, upon the bank's receipt of the sales proceeds or proceeds from any third party refinancing, the notes will be deemed fully satisfied and the bank will release the borrower and all guarantor(s), if any, from all obligations relating thereto.

2.03 <u>Class 3 (Unsecured Creditors with Allowed Claims)</u>: Warren's Corner shall, on March 31st, 2014, pay the Class 3 non-insider Creditors in full.

After all non-insider Class 3 Creditors are paid in full, then Warren's Corner shall be authorized to satisfy the Allowed Claims of Class 3 Creditors who are insiders.

C. <u>Operation of the Plan</u>

1. <u>Feasibility of the Plan</u>

This Plan is feasible as a result of the fact that, based upon historical operating data, the Debtor will have sufficient cash available to pay the Creditors' Allowed Claims on the Initial Distribution Date and subsequent distribution dates in accordance with the provisions of the Plan.

2. <u>Retention of Jurisdiction</u>

The Court shall retain jurisdiction of this Case pursuant to the provisions of Chapter 11 of the Bankruptcy Code, until final allowance or disallowance of all Claims, or to resolve all controversies affected by the Plan in respect to the following matters:

A. To enable the Debtor or Revested Debtor to consummate any and all proceedings which it may bring prior to or subsequent to entry of the Order of Confirmation, to avoid or set aside the Order of Confirmation, or to avoid or set aside liens or encumbrances, to object to Claims or the allowance thereof, or to hear and determine pending litigation in the Court, or preference litigation, or to recover any transfers, assets or damages to which the Debtor may be entitled under the applicable provisions of the Bankruptcy Code or other federal, State or local law; and to hear and determine all related litigation, contested matters or adversary proceedings pending on Confirmation Date or properly and timely filed in the Court thereafter;

B. To Classify, allow or disallow Claims, and direct distributions of funds under the Plan by the Revested Debtor, and adjudicate all controversies concerning the Classification or allowance of any Claim or security interest against the Debtor's property or Property of the Estate, if any;

C. To enforce the payment and performance of the Plan against the Debtor or against the Creditors (whether or not filing or holding Claims against the Debtor) or any Party In Interest;

D. To hear and determine all Claims arising from the rejection of Executory Contracts or leases, and to consummate the rejection and termination thereof or with respect to the Debtor's Executory Contracts, or application for determination, rejection or termination thereof having been filed prior to the entry of the Order of Confirmation, or filed in compliance with the Plan thereafter;

E. To liquidate damages in connection with any disputed, contingent or otherwise unliquidated Claim as provided in the Plan or as provided in the Bankruptcy Code;

F. To adjudicate all Claims to a security or ownership interest in any of the Debtor's property or Property of the Estate;

G. To adjudicate all Claims or controversies arising out of any purchases, sales, transactions or conveyances undertaken by Debtor during the pendency of the proceedings or any Creditors after the Confirmation Date;

H. To recover all assets and properties comprising Property of the Estate or of the Debtor under this Plan, wherever located;

I. To hear and determine matters concerning State, local and federal taxes pursuant to §§§ 505, 525 and 1146 of the Bankruptcy Code or otherwise;

J. To hear and determine matters or controversies relating to the Debtor or any attorneys or professionals retained on behalf of the Debtor after the Confirmation Date; and

K. To make, hear and determine such matters and enter such Orders as are necessary and appropriate to carry out the provisions of this Plan.

3. Modification of Plan

The Plan proponent may propose amendments or modifications to the Plan and Exhibits or the Exhibits incorporated in the Plan and attached to the Approved Disclosure Statement at any hearing on or before the Court's entry of the Order Confirming the Plan, with leave of the Court and upon notice to Creditors or parties as is deemed necessary by the Court. Either prior to or after the date of the Final Order approving the Approved Disclosure Statement, any

13

modification is subject to Approval of the Court, and so long as the proposed modification to the Plan or Exhibits to the Plan or Approved Disclosure Statement do not materially or adversely affect any Class of Creditors, or is made to remedy any defects, omissions or reconcile any inconsistencies in the Plan or Order Confirming the Plan in such a manner as may be necessary to carry out the purpose and intent of this Plan or any Class of Creditor(s) affected by the modification consent in writing, the Court shall approve such Modification.

4. General Information about the Claims Procedure

Procedures for Resolving Contested Claims

The Debtor, Revested Debtor or any Party in Interest may file with the Bankruptcy Court an objection to the Proof of Claim filed by any party or Claimant. Any objection must be in writing, must set out the name of the Creditor who filed the Claim (and any assignee), the dollar amount of the Claim and the character of the Claim. Each specific ground for objection or defense to the Claim shall be listed in a separate paragraph. Service of the objection shall be made upon the attorney of record for the Claimant (or the Creditor directly if not represented by an attorney), by serving a true and correct copy of the objection and shall be deemed complete upon mailing as set out in Bankruptcy Rule 9006(e). A certificate of service shall promptly be attached to each objection and shall comply with Local Bankruptcy Rule 9013(f).

If an Objection to a Claim is filed, the Creditor shall file a response to any such objection within twenty (20) days from the mailing date set out in the certificate of service for the objection. Responses may take one of two forms namely, a consent to the objection, or a non-consenting response. A non-consenting response shall state specific reasons for objection to each ground or defense, shall list the names and addresses of any and all witnesses to be called in support of the response, and shall include copies of all documents (including invoices, security documents and the like) relied upon by the non-consenting party to support allowance of the Claim or interest. Copies of such responses shall be served upon the Debtor, and attorneys for the Debtor. Failure to timely file a response shall result in a deemed consent to the objection, and upon the expiration of the 20-day period, the Court may enter an order without further notice of hearing. In the event a timely non-consenting response is filed, the Court shall set a hearing on not less than thirty (30) days' notice to the parties in accordance with Bankruptcy Rule 3007.

5. Debtor's Retention of Interest, Revesting of Property in Debtor, and Default Provision

The Revested Debtor shall retain its interest in the Debtor's assets under this Plan. Upon the Effective Date, title to all assets and properties whatsoever of the Debtor, sometimes referred to herein as "Property of the Estate," shall be retained by and revest in the Debtor free and clear of all Claims, liens, security and equitable interests. The Order Confirming the Plan shall be a judicial determination of the discharge of the liabilities of and Claim against the Debtor, except only as may be otherwise provided for in this Plan.

In the event a default by the Revested Debtor occurs under the Plan, whether monetary or non-monetary, the affected Creditor shall provide written notice of such default to:

14

Warren's Corner, L.P.
c/o David Monnich
3100 Nacogdoches Rd., Ste. 105
San Antonio, TX 78217-3332

**and**

William B. Kingman
Law Offices of William B. Kingman, P.C.
4040 Broadway, Suite 450
San Antonio, Texas 78209

both by United States certified mail-return receipt requested, and by United States first class mail, postage prepaid. Thereafter, the Revested Debtor shall have thirty (30) days from the earlier to occur of: (i) the date of receipt of the written notice sent by certified mail, or (ii) the date of receipt of the written notice sent by first class mail to cure the default (For the purposes of the written notice by United States first class mail, postage prepaid, such notice will be deemed received five (5) days after depositing the same in the United States mail.). In the event the Revested Debtor does not cure the default within the thirty (30) day period provided herein, the affected Creditor shall be entitled to pursue its state law remedies without further notice or hearing before the Court.

Within fifteen (15) days of the date upon which the Revested Debtor makes the initial distribution to all Creditors in Class 1 (such date being the date of the substantial consummation of the Plan), the Revested Debtor shall apply to the Bankruptcy Court for entry of a Final Decree in the Case. Pursuant to Section 350 and Bankruptcy Rule 3022, the Final Decree shall close the Case and make provisions by way of injunction or otherwise as may be equitable.

## VI.
## ALTERNATIVES TO THE PLAN

Although this Disclosure Statement is intended to provide information to assist in the formation of the judgment as to whether to vote for or against the Plan and although Creditors are not being offered, through that vote, an opportunity to express an opinion concerning alternatives to the Plan, a brief discussion of alternatives to the Plan may be useful. These alternatives include continuation of the Chapter 11 case, conversion to Chapter 7 for liquidation, dismissal of the proceedings or a Party in Interest's proposal of an alternative plan pursuant to §1121 of the Code. The Debtor, of course, believes the Plan to be in the best interest of Creditors and the Debtor. Thus, the Debtor does not favor any alternative to the Plan.

1. If this Chapter 11 proceeding continues without a confirmed Plan, there would be further delay in payments to Creditors.

2. The Debtor believes that a liquidation under Chapter 7 would not be in the best interests of all parties. As discussed in IV B above, the Debtor does not believe that the unsecured creditors would receive any distribution in a Chapter 7 proceeding.

15

3.  If this case were dismissed, the rights of all creditors would be prejudiced. The Creditors who were able to obtain State Court remedies against Debtor first would have an advantage over other Creditors. The dismissal would also create a large amount of litigation.

## VII.
## RISKS TO CREDITORS UNDER PLAN

In the event that the Plan is confirmed, the Debtor believes that the only reason why it could not perform their obligations under the Plan is if revenues declined. Therefore, barring some catastrophe outside of the control of the Debtor, the Debtor has and will have assets available to pay Creditors holding Allowed Claims on the Initial Distribution Date and subsequent Distribution Dates pursuant to the provisions of the Plan.

## VIII.
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The implementation of the Plan may have significant federal income tax consequences with respect to the Creditors and the Debtor. The following discussion summarizes such federal income tax consequences based upon the Internal Revenue Code of 1986, as amended (the "Tax Code") and the Treasury Regulations promulgated thereunder.

The Plan and its related tax consequences are complex. Treasury Regulations have not yet been promulgated with respect to many of the substantive provisions of the Tax Code that have been amended by legislation in recent years. The Debtor has not requested a ruling from the Internal Revenue Service, nor has it obtained an opinion of counsel. Accordingly, no assurance can be given as to the interpretation that the Internal Revenue Service will adopt. Further, the federal income tax consequences to any particular Creditor and the Debtor may be affected by matters not discussed below. There also may be state or local tax considerations applicable to each Creditor. THE DISCUSSION SET FORTH BELOW IS INCLUDED FOR GENERAL INFORMATION ONLY. BECAUSE THE TAX CONSEQUENCES OF THE PLAN MAY VARY DEPENDING UPON INDIVIDUAL CIRCUMSTANCES, EACH CREDITOR AND INVESTOR IS URGED TO CONSULT ITS OWN TAX ADVISOR AS TO THE CONSEQUENCES OF THE PLAN UNDER APPLICABLE FEDERAL, STATE, AND LOCAL TAX LAWS.

A. Federal Income Tax Consequences to Creditors

The federal income tax consequences of the implementation of the Plan to a Creditor will depend in part on whether, for federal income tax purposes, the obligation from which a Creditor's Claim arose constitutes a "security." The determination as to whether an obligation from which a Creditor's Claim arose constitutes a "security" for federal income tax purposes is complex. It depends on the facts and circumstances surrounding the origin and nature of the obligation. Generally, corporate debt obligations evidenced by written instruments with original maturities of ten years or more constitute "securities." Although it appears that most of the Creditors' Claims do not constitute "securities," the Debtor expresses no views with respect to

whether the obligation from which a particular Creditor's Claim arose constitutes a "security" for federal income tax purposes. Creditors are urged to consult their own tax advisors in this regard.

Exchanges by Creditors whose claims arise from obligations that do not constitute "securities," or whose claims are for wages or services, will be fully taxable exchanges for federal income tax purposes. Such Creditors who receive solely cash in discharge of their Claims, will recognize gain or loss, as the case may be, equal to the difference between (i) the amount realized by the Creditor in respect of its Claim (other than any Claim for accrued interest) and (ii) the Creditor's tax basis in its Claim (other than any Claim for accrued interest). For federal income tax purposes, the "amount realized" by a Creditor who receives solely cash in discharge of its Claim will be the amount of cash received by such Creditor.

Where gain or loss is recognized by a Creditor, the character of such gain or loss as a long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Creditor, whether the obligation from which a claim arose has been held for more than six months, and whether and to what extent the Creditor has previously claimed a bad debt deduction. The capital gains deduction for individuals and the alternate tax for corporate net capital gain has been repealed and capital gain is currently taxed to individuals and corporations at their respective maximum tax rates. However, the definitions of long-term and short-term capital gain or loss have not been repealed.

To the extent any amount received (whether cash or other property) by a Creditor is received in discharge of interest accrued on its Claim during its holding period, such amount will be taxable to the Creditor as interest income (if not previously included in the Creditor's gross income). Conversely, a Creditor will recognize a deductible loss (or, possibly, a write-off against a reserve for bad debts) to the extent any interest accrued on its Claim was previously included in the Creditor's gross income and is not paid in full.

## IX.
## PENDING LITIGATION OR ACTIONS PERTAINING TO FRAUDULENT TRANSFERS, VOIDABLE PREFERENCES AND EQUITABLE SUBORDINATION IN THE BANKRUPTCY PROCEEDING

No preference, lien avoidance or fraudulent transfer litigation has been commenced by the Debtor; however, the Debtor reserves all claims and rights to pursue claims against its Secured and Unsecured Creditors. In connection herewith, the Debtor shall retain all preference claims and any other causes of action set forth in Chapter 5 of the Bankruptcy Code and/or provided by state law including avoidance actions to set aside security interests and/or liens claimed to be held by the Creditors.

Furthermore, Warren's Corner is continuing to review certain documents and claims to determine if there are additional claims and causes of action under Chapter 5 of the Bankruptcy Code that it will retain and/or pursue after Plan confirmation. As part of such investigation, Warren's Corner, in its Statement of Financial Affairs on file in this proceeding, has listed all payments to creditors occurring within 90 days prior to the Petition Date and all payments to "insiders" made within a year prior to the bankruptcy proceeding. Some of these payments might

be avoidable pursuant to the provisions of Chapter 5 of the Bankruptcy Code. In addition, there might be transfers that are avoidable pursuant to Chapter 5 of the Bankruptcy Code and applicable state law. Each Creditor authorized to vote on Warren's Corner's Plan should review his/her/its records to determine if it received a payment of transfer that might be avoidable pursuant to the provisions of the Bankruptcy Code and applicable state law. Warren's Corner will, at Plan confirmation, provide a schedule of claims that it shall retains. Therefore, Warren's Corner reserves all rights to amend, modify, or supplement the schedule of retained causes of action.

In addition, Warren's Corner asserts that it has a claim against First National Bank. If the Debtor's Plan is confirmed, Warren's Corner will not pursue such claim.

All litigation that was pending prior the initiation of this bankruptcy proceeding is stayed and all parties who asserted a claim against Warren's Corner prior to the initiation of the case has had the opportunity to file their respective proof of claim in this bankruptcy proceeding.

## X.
## SUMMARY OF SIGNIFICANT ORDERS ENTERED DURING THE CASE

<u>Title</u>
Order Relating to Use of Cash Collateral

## XI.
## CONCLUSION

The materials provided in this Disclosure Statement are intended to assist you in voting for the Plan of Reorganization in an informed manner. If the Plan is confirmed you will be bound by its terms, so you are urged to review this material and make such further inquiries as you may deem appropriate and then cast an informed vote on the Plan. The Debtor believes that a reorganization of the Debtor pursuant to the Debtor's Plan will provide an opportunity for creditors to receive more than would be received by liquidation of assets under Chapter 7 of the Code.

Respectfully submitted on October 15th, 2013

**WARREN'S CORNER, L.P.**,
a New York limited partnership

By: Development Strategies Warren's Corner, L.L.C., a Texas limited liability company

By: */s/David W. Monnich*
David W. Monnich, Managing Member of the General Partner

18

## CERTIFICATE OF SERVICE

      I hereby certify that a true and correct copy of this document has been sent to the parties requesting notice in this matter via the Court's ECF System on October 15th, 2013:

                                              /s/*William B. Kingman*
                                              William B. Kingman